Yes, Your Honor, I'd like to reserve five minutes for rebuttal, if I may. You may. Thank you. May it please the Court, my name is Norman Heil of Orokarrington and Sutcliffe, representing the petitioner Kevin Cooper. The district court denial of petitioner's petition for rid of habeas corpus to reverse his conviction and death sentence must be reversed so that, in a fair and unbiased habeas proceeding, the testing that this Court ordered on February 9th of 2004 can be done and petitioner can prove his innocence. In addition, however, petitioner's conviction and death sentence must be overturned now because, as has been shown by the record established in the district court but ignored by the district court, petitioner's constitutional rights were violated by the prosecution's suppression of material, exculpatory evidence in violation of the Supreme Court's ruling in Brady v. Maryland. I will first address the reasons why this Court's mandate with respect to testing has not been fulfilled and why the proceeding was not fair and unbiased as it should have been. I'll then turn to the Brady violations that we contend have been established. First of all, with respect to the testing, the first type of testing that the Court ordered was EDTA testing of the T-shirt. And what actually happened in the district court was inconclusive, botched, and useless. The EDTA testing had several flaws. First, at no time was petitioner or his experts allowed to examine the T-shirt to determine what stain should be tested or how it should be done. We were excluded from any contact with the T-shirt during the testing process. Second, the stain that was tested at the district court's choice was a stain never before tested, and therefore no one knows whether it was a blood stain or whether it had petitioner's DNA in it. Therefore, the testing that was done cannot possibly have any relevance to the claim of tampering that petitioner has made in this case. As the Court knows, the claim that was made and which this Court ordered to be tested was that the prior testing of the stains which showed petitioner's DNA were the result of tampering. Therefore, to test a stain which has not yet been proven to be blood or to have petitioner's DNA in it is totally useless for purposes of any conclusions. Now, the next problem with the testing with respect to EDTA was that the stain that was testing that was tested was collected without any participation from petitioner. And in fact, what happened was the stain which has been described and given a designation of it was not the stain which had previously been tested. And in fact, the respondent suggested that the stain to be tested, with which we agreed, was 6G. And then finally, when it was about to be tested, the respondent had to admit that that stain had disappeared. As a result, again without any input or consultation or examination by petitioner's experts, the Court chose an area on the T-shirt that had not been tested before and for which there had been no proof that it was either a blood stain or that it had petitioner's DNA. Therefore, collecting the sample really was a useless task. However, significantly for purposes of the district court's ruling with respect to Daubert, when the testing was done, petitioner's expert, Dr. Ballard, was able to detect which were the control samples and which were not, thereby proving that the method of testing was scientifically accurate in arriving at a conclusion. The last thing that happened with respect to the flawed testing was that the same sample that was tested by respondent's EDT expert, Dr. Suzdak, originally showed a positive finding. But when that was shown, Dr. Suzdak suddenly withdrew his report, claiming that there had been contamination in the report. The district court denied us the ability to review Dr. Suzdak's methods and findings, and we were not able to figure out – I'm sorry, Judge. Counsel, what do you mean by contamination in the report? What Dr. Suzdak said when he withdrew his findings with respect to the findings of her EDTA was that there had been contamination in his laboratory with respect to other uses of EDTA. We, of course, don't know exactly because all we have is that report. But what he said was that his findings with respect to EDTA could not be given any credence because somehow within his laboratory – we don't know exactly what it was or why. We asked to see that and weren't given it. But somehow in his laboratory there was EDTA present, and therefore it would have contaminated any results he got. Well, just to make sure we're talking from the same baseline, EDTA is present in more substances than the other end of a blood sample test tube, correct? Yes, it is quite prevalent in the environment, and that is one of the reasons that the testing that Dr. Ballard set up and that he re-suggested to the court have controls so that it could be determined whether or not a level of EDTA that was not part of the stain, what that was for a controlled sample. What confuses me then is the suggestion in your brief that somehow Dr. Suzdak's results support your tampering theory because the fact that a sample might be contaminated within a laboratory that is his own laboratory done after the fact, I'm not sure how that links with your tampering theory. Well, Judge McCune, we do not contend that Dr. Suzdak's results necessarily prove the tampering claim. In fact, that's the whole point. You said it supported your theory, did you not, in your reply brief? Yes, and it supports our theory because it shows that EDTA testing can be done if it's done correctly, and what we wanted to do was to find out why it was that he received a positive result and yet then told us, we have no way because we haven't seen it, that that positive result came from contamination in the laboratory. We do assert that the testing that was done by Dr. Ballard and Dr. Suzdak on the wrong stain cannot be something which is conclusive one way or another, but we would like to know what it is that Dr. Suzdak did, A, that resulted in the results he got, and B, in causing the contamination so we can make sure, if nothing else, that that doesn't happen the next time. What happened with Dr. DeForest as to why he was eliminated or excluded? Yes, it's an important point, Your Honor. Dr. DeForest said to the district court that he wanted to have a chance to examine the T-shirt before a protocol was established for the EDTA testing, and as one of the most nationally well-known people in this forensic field, we would have expected the district court to at least listen to that. Unfortunately, the district court rejected that, and Dr. DeForest sent a letter to the district court saying, if I'm not going to be able to examine the T-shirt so I can give my scientific analysis as to how the testing should be done, then I don't want to participate in something that's being done this way. And the district court, therefore, said, well, then you're out, and we'll just have respondent be the one to decide this. We would have preferred that Dr. DeForest didn't put his point so bluntly, but the fact of the matter was that was the basic problem with the way the district court was proceeding. That is that the district court said that the testing would be set up, designed, and implemented without the forensic scientists having input as to how it should be done. And what was crucial- It seems to me that the district court afforded both counsel extensive opportunities for input into the protocol. I mean, eight or nine different hearings with respect to it, opportunities to brief it. Yes, Judge Reimer, and let me- when Dr. DeForest took the position he took, substituted cell mark to which there was no objection. So where does this go? Judge Reimer, the problem here was that while we obviously had no choice but to present protocols to the district court after Judge- sorry, after Dr. DeForest was eliminated because we wanted to do the best we could, there was no way that we could devise a protocol that we felt was scientifically valid without his input having looked at the shirt. And yes, we may be faulted for doing our best to go ahead without that input, but without that input, we really couldn't devise a protocol. But let me add something to the protocol that we proposed to the district court. What we proposed to the district court would at least eliminate the problem that is here before you today. What we proposed was that the court would have tested the prior stains on the T-shirt where Petitioner's DNA in blood had been found. And the stain that the district court ended up testing did not have that. So even the protocol that we were able to put together without the input of Dr. DeForest was not followed by the district court. And what happened was that after the protocols were put together and after Dr. DeForest had asked for the right to view the T-shirt, the court decided to test stain 6G. And the respondent said, that's fine, we've got it, let's do it. Their scientist even said so. And then suddenly, in their response to our protocol, the respondent said, oops, sorry, 6G has disappeared. It is no longer there to be tested. And therefore, what was chosen without any of our input was a stain that was not yet proved to be a blood stain and which has never been tested to see whether or not it has Petitioner's DNA. You're serious? It was contaminated. Yes, but you have to choose a stain that has blood and Petitioner's DNA in order to first have a valid test as to whether or not heightened EDTA is present. And that was not done in this case. The district court chose a stain without knowing whether it was blood and without knowing whether it had DNA. And now, and we pointed this out to the district court, at least we were able to tell the district court this. Once you do an EDTA test, you can no longer do a blood or a DNA test. Dr. Ballard testified to that. What should have been done, if we were going to be testing a stain that had not previously been tested for blood or DNA, was to do those tests first, not only because that would make the stain relevant, but because you can't do it after you do the EDTA testing. And therefore, we had this basic flaw in the way in which the EDTA testing was done. Now, what we would like to do, what we suggest would be done, if we're remanded, which we say needs to be done in order to meet this Court's mandate, is to go back and have Dr. DeForest or an expert from Petitioner's side, if the district court refuses to allow Dr. DeForest to participate, although there's no reason why he should not be allowed to participate in doing what he said he needed to do first, go back and look at those stains and determine which stain can be tested. In the prior testing in 2002, there were several stains that were tested that were found to have both blood and Petitioner's DNA in it. From our examination of the T-shirt, it looks as if there are still areas of those stains which remain on the T-shirt which were not part of what was cut out. All of this was something that you could have pointed out to the district court before the results came in, but didn't. Well, I respectfully disagree, Judge Reimer. We pointed out and objected to the way that the court was proceeding at every step of the way in the testing. In a very generalized way, but nothing of the sort that you're now arguing about. I mean, at no point did you ask for presumptive blood testing. The reason that we didn't in the first protocol that we presented ask for presumptive blood testing was because we set up the testing in our protocol to be done of stains that had already been tested, found to have blood, and found to have the Petitioner's DNA. No one was expecting to test an as yet untested stain until 6G was found to have gone missing by the respondent. And are you now suggesting that the area that was selected by Cellmark between the two stains, I think it was 6J and 6K, did not have blood that was Cooper's DNA? Yes, that has never been shown in any test, and that's the whole point of our argument. Right? I'm sorry.  I'm sorry. No. No. The stain was between those two stains. Yes, I understand that. And therefore, it was not yet determined to be the same as either of those two stains. All right. Now, did you ever mention to the district judge before the test results were in that there was any concern about migration? I will have to look at the record to see, Your Honor, but when we did object strenuously to the fact that a stain was being tested that we had no input in and that, as far as we knew, had never been tested before for either blood or DNA. And that is the crucial part to our argument here today with respect to EDTA testing. That is that we have no conclusion that can be drawn from the testing that was done because we don't know whether what was tested was blood and whether it had petitioner's DNA in it. Therefore, whether... Let me ask you this. If, even without knowing those two items, if the test showed that there was no so-called elevated EDTA, what would that demonstrate? It wouldn't demonstrate anything unless you knew, Your Honor, that this stain previously was a blood stain that had petitioner's DNA in it. Well, why would it need his DNA in it if the question is what EDTA is in blood generally as opposed to blood that comes out of a sample bottle? The only way in which the tampering claim makes logical sense is if one finds first that there is petitioner's blood, therefore with his DNA in it, and it has heightened EDTA. If what is tested has not been established first to be a stain that contains petitioner's blood, then a heightened EDTA is meaningless for purposes of what it shows. And that's all that we're saying is that in order... My question is the opposite. What if it shows an absence of a heightened EDTA? Well, it may not be blood, and therefore it would obviously probably not have heightened EDTA, which I think may be what Dr. Ballard's test results show, is that this particular stain does not have the contamination of blood from a purple top tube, and therefore it doesn't have heightened EDTA because it's not a blood stain from petitioner. That's the whole point of this... Now, we understand the point of the exercise. I'm just trying to understand what was shown or what could be shown from what you did have. You have a lot of ground to cover. Let me ask you a couple of specific questions. I'd like to turn to the shoes, please. There is various reference... There are various references in the briefs that Mr. Cooper... that there is testimony from Mr. Cooper himself that he was wearing these prison-issued shoes. Is that part of his testimony? There is a question that the prosecution asks during the case to which he responds that one would take it from that that he admitted it, although it's not a clear admission and he did not testify on direct or in any other way that he had on Pro-Ked's tennis shoes. But what did they ask him and what did he say? The question was had he received Pro-Ked shoes, and I think the answer was he did not deny it. But the issue with respect to the Brady claim that we are raising, of course, would be there regardless of whether or not he admitted that he had Pro-Ked's shoes because... You could still have... Let's just assume that there was sufficient evidence under Brady that hadn't been turned over as to the broader availability of these shoes. You would still have to benchmark that ultimately against the testimony in the record and what was known about shoes being issued by the institution, would you not? Yes, and let me just be very specific with respect to what the Brady claim is here. Our claim is that the prosecution failed to divulge to the defense that Midge Carroll, the warden at CIM, had called during trial to tell the prosecution or the sheriff's office that the proof that they were putting on about how these shoes were only available at CIM was incorrect. That had to be disclosed to the defense and it was not. And as a result, the prosecution was able to argue very forcefully in closing argument that the shoes that Petitioner was alleged to be wearing were strictly for prison use, something which has now been proven to be untrue, and that they were unavailable for retail stores in California, something which has also been shown now to be untrue. And our Brady claim is that had the prosecution disclosed, as was its requirement, to the defense during trial, that Midge Carroll, the warden at CIM, had I understand what your claim is. What is the testimony as to the availability of these shoes for individual purchase, individual retail purchase, as opposed to the testimony about the, you know, The evidence that we were able to develop at the evidentiary hearing in this case for the first time was that the Pro-Keds shoes, which the prosecution said were strictly for prison use and unavailable in retail stores, were in fact sold in a stride-right catalog at the time of the murders, were in a catalog available to retail stores. And we also showed through the testimony of Don Luck, one of the executives from stride-right, that the fact that the shoes were in the catalog for retail stores, he couldn't rule out the fact that they were available generally and in California. And that evidence was something that only came to light during this latest proceeding because it wasn't until this proceeding that we were able to find out about what had been undisclosed from the defense during the trial. And let me just add to this with respect to the unfair hearing. The person who testified at trial in 1985 with respect to the stride-right issue, a person named Dewey Newberry, was someone who, at the beginning of the proceeding in the district court, we asked the court to allow us to ask questions of because we found out that he was in Hong Kong and therefore unavailable to subpoena. And the court said, that's fine, both sides send me questions to ask to Mr. Newberry so that we could get the answer to some of these questions we had to rely upon Mr. Luck for. And instead of, after we submitted our questions and the respondent submitted none, the court said, well, we won't bother with that. And we were never able to get those questions to Mr. Newberry. That's the way that the proceeding went. Whenever it was something that we were trying to get, if it was something that we wanted, we didn't get it. If the respondent wanted it, then they got it. Another question I have relates to the potential third-party perpetrator claim that you made and evidence regarding seeing three men leaving in what was the family station wagon. Sometimes in the briefs or in the arguments there's reference made to white men, but I'm wondering in the evidence and the statements to police, is there anything that says white men as opposed to men or young people? Yes. In an exhibit which we first saw at this hearing, which is exhibit UUU, three U's, there is a report in the daily log of the police which says three young males. It does not say what their ethnicity is. My question is very simple. Is there a document in which they are identified as white? Yes, and that's where I'm going to get to. What is that document? That is in Josh Ryan's interviews with the police and the testimony of the police at trial and at the preliminary hearings. We have evidence. Stop, stop, stop, stop. My question is, is there a testimony about white men leaving in the station wagon? No. The testimony about white men is from Josh Ryan. Okay. Thank you. You have about four and a half minutes. Did you want to reserve the remainder? Yes, I would like to reserve the remainder. Thank you. You're welcome. Thank you, Your Honors. Holly Wilkins, California Deputy Attorney General for the Respondent. In the decision of the en banc court in the 11th hour before Kevin Cooper's scheduled execution, Judges Silverman and Rollins observed that Kevin Cooper is either guilty as sent or he has been framed by police. There is no middle ground. Indeed, there is no middle ground in this case, and Kevin Cooper is guilty as sent. His implausible tampering theory relates to a piece of evidence that was never used against Kevin Cooper at trial. It was marked into evidence by the defense. It was used to make an argument attempting to engender reasonable doubt as to three bar patrons that were never subsequently located. It was never known that there was any connection between this garment and the Ryan Hughes murders until 2002 when agreed-upon post-conviction DNA evidence yielded DNA profiles matching both Kevin Cooper and the DNA of his victims. The amount of blood being referenced with respect to these various stains is less than one-fiftieth of one drop of blood. The allegation is that such a minute quantity of blood was planted, apparently in anticipation of the development of Nobel Prize-winning science, to be discovered years after the trial and to yield DNA evidence. Kevin Cooper was given the benefit of EDTA testing by his chosen expert, and the results by his chosen expert did not support his implausible tampering theory. He was also given the benefit of mitochondrial DNA testing, which yielded the same result that was derived at trial from the examination of the hair evidence by Kevin Cooper's defense expert. Would you please respond to the argument by Mr. Cooper's counsel that the stain that was tested on the remand hearing was not one that had been benchmarked earlier as either being the substance blood or with Mr. Cooper's DNA, and therefore even if the testing were viewed as reliable or admissible, that it would not prove anything? Well, the stain that was originally chosen in fact did not disappear. What happened was the DOJ scientist did not examine the shirt in making their recommendation to Judge Huff. Instead, the DOJ scientist relied upon their notes and photographs of the documentation that had been made at the time of the agreed-upon DNA testing. Both Kevin Cooper's expert, Dr. Blake, and the DOJ scientist examined the shirt at that time, fully documenting all of the testing done to the shirt. Unfortunately, the DOJ expert did not appreciate at the time that there was subsequently presumptive blood testing done in the area of the selected stain at the urging of Dr. Blake. Accordingly, more was consumed than was appreciated at the time the recommendation was made. As Judge Huff pointed out, both sides had equal access to the documentation of the shirt, and both sides had equal opportunity to know that the portion that was selected was no longer usable. Well, let me ask you about that then. If the portion was no longer usable, and it seems clear from the record that once you have gone through the EDTA testing that you can no longer go through DNA or blood testing. Do you agree with that in terms of the same sample? Is that what the record shows? You could not do the presumptive testing, but there's been a great deal of debate about that. There was no agreement between Mr. Cooper's experts and our experts, but it is our position. They say that your experts agree there couldn't be presumptive testing once you undertook. That is correct. Okay. So my question then is there was this statement made by the judges in the bank court, and I think everybody had the vision that there was going to be sort of a yes or no proposition as a result of this testing. What then, in your view, did the testing reveal if it couldn't be determined whether or not it was Mr. Cooper's blood with his DNA? Well, frankly, the entire testing process, which consumed numerous proceedings and consultations, it basically proved what the Justice Department contended from the outset. The Justice Department scientist advised Judge Huff at the outset this was a highly varied substrate of unknown history. They did not believe there was any scientifically valid way to account for the myriad of possibilities for the presence of EDTA throughout this highly varied substrate. And, in fact, the DOJ scientist expressed great concern about migration, and Dr. Ballard was asked about migration in the initial science tutorial conducted by Judge Huff. He was quite dismissive of the concept at the time. He said that it really wasn't much of an issue, and in his mind, if indeed there had been migration, it should be visible. It should be visible when the control areas are selected. It was only after Dr. Ballard's test results were adverse to the tampering theory that suddenly migration was entertained as a possible explanation for the presence of unknown DNA in a control area. And what's ironic is if, in fact, DNA has migrated from the minute stain that was tested or from some other stain, this only proves the Justice Department's contention from the outset that this is a highly varied substrate of unknown history, and there is no scientifically valid method to make a forensic determination as to the source of EDTA. EDTA has no identifiable means of tracing it to a source. The amount of EDTA in preserved blood is .13 percent. It is 20 percent in detergents. And with respect to the tampering or the contamination in Dr. Sweczak's lab, DOJ scientists indicated at the outset to Judge Huff that it is exceedingly difficult to conduct any of these tests because laboratories throughout the country use EDTA in their testing, and so the prospect of contamination was great. And naturally, when Dr. Sweczak produced results that he later realized showed the presence of EDTA in the buffer solution that was a control and should have had none, he realized his results had been contaminated. And counsel for Mr. Cooper sought to conduct a separate investigation to discern the difficulty at Dr. Sweczak's lab with great suspicion. Dr. Sweczak is an academic. He had no bias and no incentive for which to change his results. We produced expert testimony from another independent academic scientist, Dr. Terry Lee with the City of Hope. He indicated to Judge Huff, in his professional opinion, there would be no means by which to work backwards and trace the source of contamination. As to needing to know how contamination occurred in order to avoid it in subsequent testing, that's not something that needs to be pursued because, as Judge Huff made clear, this particular testing does not meet scientific reliability standards, and she is not alone in her opinion as to the dubious nature of this science in the context of a forensic setting. There's only one other case where this evidence has ever been admitted, and that was in a case where it was not challenged. But in the Pompeii case in New Jersey, there was great concern about the validity of the science and great concern about Dr. Ballard. Nevertheless, Judge Huff allowed Mr. Cooper the benefit of EDTA testing, despite the vigorous objections of the State from the outset, and despite Judge Huff's own reservations about Dr. Ballard's bias, qualifications, and the science itself. She nevertheless allowed the science to go forward, and Mr. Cooper's own hand-chosen expert, apparently the only one in the country who undertakes this testing,  this Court was told in the 11th hour, if there are not elevated levels of EDTA, it disproves tampering. It was represented as a quick, definitive test, and it was only Let me ask you this. That is what I think the Court anticipated and what counsel had represented, but the State's criminalist, Myers, had actually said, given what he knew later as he was going through it, he wouldn't have chosen that sample for the reason that he realized that it wasn't actually a sample where they had found Mr. Cooper's DNA in the blood. So is the net result of all this testing a wash, basically that it doesn't prove anything at the end of the day, one way or the other? Well, it proves absolutely nothing, and equally important, one of the contentions that we presented to Judge Huff was you could test every bit of this shirt. You could spend years testing this shirt, trying to determine the various levels of EDTA throughout the garment, and it would show you nothing. You could expend lots of money and lots of time, but when you have a garment that you don't know how it's been handled, how it's been treated, it's been out in the elements, it's over 20 years old, it is indeed such a highly varied substrate that you cannot account for the sources of EDTA, and this was our contention at the outset. This is Judge Huff's findings, and so all of this testing shows nothing, and it cannot show anything. Looking at the Brady claims and the claims of certain evidence that had not been turned over by the State until later, was the trial jury aware that there had been a set of coveralls that had been destroyed? Yes, in fact, they were, Your Honor. The defense knew about the coveralls. They received a report about the recovery of the coveralls, and they had that information and showed absolutely no interest in the pair of coveralls. Once they discovered that they had been inadvertently destroyed by police, they showed great interest, and they had access to the officer who destroyed them as well as his supervisor. They then were permitted to come in before the jury and to present evidence that the police had, in fact, destroyed these coveralls. They were able to do it without presenting the testimony of a witness who was absolutely lacking in credibility and had no credible evidence to connect the coveralls to the crimes. So it was a win proposition for the defense because the jury was allowed to consider the destruction of this evidence and how it affected their consideration of the evidence. So this is nothing new. Indeed, the only new evidence of any reliability that has been presented since the time of trial is the post-conviction DNA nuclear testing results from 2002, which indeed is damning evidence confirming all of the evidence that was presented at trial. On the DNA evidence, I think some of the focus has been on this spot that's called number 41 that came from the wall. Yes, Your Honor. But there is also testimony in the habeas proceeding about the criminal, Mr. Investigator Gregonis, actually having either misstated or lied or misrepresented whether he had opened it and what he had done with that particular sample in terms of maintaining its integrity. What is the State's response on that allegation? That was determined in an evidentiary hearing before Judge Kennedy in the State Trial Court. All of his findings rejecting all of the vague, unsupported tampering allegations are entitled to deference and indeed were afforded deference by Judge Huff, independent of her alternative findings, rejecting all of these allegations on the merits. In looking at the Brady claim, is it your position that after House that we look at that under AEDPA in terms of how we're looking at everything, or are we looking under SHLUIP or some other standard? This is a second and successive petition. With respect to the freestanding actual innocence claim, this Court need not reach the question of whether or not a freestanding actual innocence claim is subject to the limitations on a successive petition pursuant to 2244B. The reason being is that an actual innocence claim under any of the standards, SHLUIP or HERRERA, would be contingent upon newly discovered and reliable evidence, of which we have none. As this panel, the majority of this panel observed in the 11th hour, virtually everything that has been brought forward by the defense are matters that have been litigated since the time of trial or on direct appeal or certainly in the early collateral challenges. There is nothing new. It is a rehash of issues that have been resolved adversely to Kevin Cooper by every court that it has come before. I note that counsel for Mr. Cooper references the mandate of this Court from the 11th hour. In truth, as a matter of law, the mandate of this Court reflected a preliminary determination that was made by the en banc majority after only hours of consideration of a case that they had no prior familiarity with. You had in excess of two decades of preliminary or procedural history, and you had evidence that had been considered again and again and again by both state and federal courts that the 11th hour forced the en banc panel to review in a matter of hours. And they made a preliminary determination that is not binding upon the district court. Indeed, the United States Supreme Court makes clear it must be determined anew, and it is not binding upon this Court. And that preliminary determination was limited to finding that former Warden Carroll had come forward with newly discovered evidence, and if true, Kevin Cooper could not have been wearing the distinct shoes. Well, in truth, we now know that that was not Kevin Cooper's claim. He never asserted that the shoes could not be obtained from the prison. Instead, his claim related to whether or not those shoes were available at Sears and other similar retail outlets. So we have a situation where Kevin Cooper has relied upon a preliminary determination by an en banc panel in the 11th hour before his execution. And that determination was preliminary, and it was based on misinformation, and it was based on misleading information about the availability of testing that was not scientifically valid. It was based on a belief that Warden Carroll had only recently been discovered by the defense. In truth, when Judge Huff took evidence, she received testimony that the defense discovered Warden Carroll's misinformation as early as 2001. And not only did they receive former Warden Carroll's misinformation in 2001, they knew it to be false in 2001. It is axiomatic that you cannot have a Brady violation based on information that is untrue. Certainly, a rumor that bears no truth is neither material nor exculpatory. These are the circumstances. Let me ask you the same question that I posed to Mr. Cooper's counsel, and that is about the trial evidence on the ProCad shoes being worn by Mr. Cooper. He phrased it that Mr. Cooper didn't deny it. Some of the briefs say he essentially acknowledged that he had this kind of shoe on. What is your statement or version with respect to what the testimony says on his actually, you know, wearing a set of these prison-issue shoes? He was asked if he was wearing the shoes that he had from prison in the hideout house. He indicated, yes, he was wearing those shoes. So then the issue became solely whether some other number of people could be wearing those shoes. It was a question of availability, not that he didn't have prison-issue shoes. Correct. And also, over time, Judge Huff has conducted two separate evidentiary hearings in this matter. In the first evidentiary hearing she conducted, the defense trial file was received into evidence before Judge Huff. And once again, it was received into evidence in the most recent hearings. And in those materials, there is a transcript of an interview by a defense investigator of Kevin Cooper. And frankly, Mr. Cooper's complaint was he felt he got the prison-issued sneakers elsewhere. Not that he never got them. It's quite clear that he received this particular model and brand of shoe from the prison. So it really has no bearing on truth to suggest that Mr. Cooper didn't have these shoes. And as the majority of the three-judge panel pointed out in the 11th hour, the significance of the shoe evidence is what ties Kevin Cooper to these shoes, not whether they were, in fact, available at Sears, which, in fact, they were not. And counsel suggests that they have proven that these shoes were available for retail sale. Well, the catalog that counsel has told this court was recently discovered to them, that's not accurate at all. In the trial record, the catalog is referenced by Mr. Newberry. Defense trial counsel has known about it since the time of trial because it's referenced right there in the trial testimony. And Mr. Luck, it was amazing, from his own personal knowledge, he was able to refute that there were any sales to major retails because Mr. Luck was indeed in charge of all of these sales and has extensive knowledge. And so he was able to testify and explain to Judge Huff that, under no circumstances, was a major retailer a purchaser of these shoes. He could not, from his own personal recollection, 22 years later, rule out the possibility of a sale through the catalog to a small mom-and-pop type retailer. So Mr. Cooper has not even proven that such sales occurred. Rather, the State, when compelled to produce this evidence over 23 years later, could not affirmatively disprove sales. But, again, it begs the question and overlooks the issue, which is all of the litigation strategy of Mr. Cooper, is how could someone come into this hideout house close in time to when Mr. Cooper claims that he simply walked out of the area despite a massive manhunt under Sue? Why would this person come into this hideout house of Mr. Cooper's, 126 yards from the Ryan family, select weapons, including a hatchet, to go next door and slaughter a family, and leave footprints with a distinctive diamond pattern matching the same shoe that Mr. Cooper was issued by the prison in the same shoe size as Mr. Cooper, and leave a print inside the hideout house occupied by Mr. Cooper, go 126 yards away and leave a print on the spa cover outside the Ryan master bedroom, outside the sliding glass door, and inside the Ryan master bedroom, a partial print in blood? This is the weight of the evidence, not whether it was available to some other individual. As Mr. Luck explained, this was not a popular shoe, and he made that quite clear in comparing the various sales of large manufacturers compared to the relatively inexpensive, unpopular, pro-kid dude shoe. And again... I ask you about two other pieces of evidence that Mr. Cooper's counsel has asked us to consider in the second habeas. One has to do with the blue T-shirt that also was destroyed. Was that, was evidence of that T-shirt before the jury or available to the defense at the time of trial? This particular contention by Mr. Cooper underscores why we have years... My question, I'm trying, I don't want an argument. I just want to understand what the evidence shows. Was that available, was it in police possession and turned over in terms of its existence to Mr. Cooper's counsel at the time of the trial? Your Honor, the log of the police department that reflects the collection, they received a telephone call and it indicates the telephone call described a blue shirt. The shirt was then collected by the same officer who collected the tan shirt that we have been discussing earlier. It is our belief that the reference to a blue shirt in the log was a mistake. There was never a blue shirt logged into evidence. Instead, the same officer who retrieved the shirt that was logged into evidence, who is now deceased, put that into evidence. But the key point is the defense was in possession of all these logs at the time of trial. The time to explore the custody of the supposed blue shirt was at the time of trial. The counsel mentioned that they had just learned of evidence relating to a report of three white males. That was, again, from the sheriff's logs that were turned over at the time of trial. We have expansive jurisprudence that controls what we inquire into 20, 22 years after the fact. And as Your Honor noted, this is a successive petition. There are very steep hurdles by which you must clear to be heard anew. And Judge Huff found that none of Mr. Cooper's claims surpassed the hurdle of 2244B. In fact, apart from the sheriff's log with respect to testimony about the men leaving, was there also testimony about that from witnesses? No, there was one couple that had come forward, the Lenards, and they did testify at trial. And they had seen a station wagon occupied by three white males. They reported it to police. They came and testified at trial as to their observations, because they themselves thought they had seen something relevant. And that wasn't presented. The extent that the log was simply a reflection of that report that they testified to at trial, would that be correct? It related to it, yes. This is a log of all the incoming calls to the police dispatch. It does not suggest that, in fact, particular evidence ever materialized. They were collecting evidence around the clock. It's our belief that the date on the report for the tan T-shirt was in error. This is something the defense trial counsel could have focused on at trial. He chose not to. It's not something that can be raised 23 years after the fact. And there's no basis upon which to believe that there's any material evidence involved. Again, looking at the totality of the evidence in this case, the sheer volume and consistency of the evidence that was presented at trial remains overwhelming. It has only been reaffirmed through agreed-upon post-conviction nuclear DNA testing. There is no doubt as to Kevin Cooper's guilt. These proceedings in a successive petition are not permitted to delve into things that were not raised at the time of trial that must have been raised at the time of trial. And, again, I would only urge this Court to affirm each and every ruling of Judge Huff. She has ruled that none of these claims come properly before the Federal Court because Mr. Cooper has not satisfied his burden. Indeed, many of these claims are mandatorily barred. And those that are not mandatorily barred because they, in fact, have been litigated before, they can only be heard if they are newly discovered. And none of them are newly discovered, as Judge Huff found from the testimony before her. Judge Huff took testimony from 42 witnesses. She conducted the EDTA testing and the mitochondrial DNA testing urged by the Ninth Circuit, and she addressed each and every concern of the Ninth Circuit expressed in the 11th hour. None of Mr. Cooper's allegations have any validity whatsoever. There is absolutely no evidence to support any of his myriad of implausible, tampering theories. Mr. Cooper is suggesting that every person who has come into play in this case, all the scientists, all the experts, all the attorneys, all the officers are either incompetent or corrupt, and all the many judges who have repeatedly rejected his claims are blind to the injustice of it all. In truth, Mr. Cooper secured an 11th hour stay of execution in this matter based on misinformation and misleading this Court, and he has obtained a three-year reprieve at this point that should go no further. We ask this Court to affirm Judge Huff's very thorough, careful ruling in its entirety, and we say enough is enough. It's time for a full affirmance. Thank you. Thank you. You have four and a half minutes for rebuttal. Thank you, Your Honor. It's true, as Ms. Wilkins has said, that many times a case gets this far before it is found that a person is innocent. That's why we worry about cases like this so much, and the fact that there have been rulings in the past does not automatically mean that this Court should rubber stamp what went before. Counsel, it's not an issue of a rubber stamp. There are laws that tell us what can be considered and ruled on in a second or successive petition, so I really think you have to address those issues and tell us what wasn't litigated before on which a claim can be sustained by newly discovered evidence. Yes, Judge Gould, and let me just, I put together a list after listening to Respondent's argument, and let me just start with that list, the new evidence. The disposition report is something which has not been part of evidence, and we put on a lot of evidence relating to the fact that it shows completely different from what the prosecution said. They said that Detective Eckley destroyed the coveralls without approval of anybody else, but, in fact, the disposition report shows that his supervisor, Kenneth Schreckengraust, approved the destruction, and Schreckengraust testified at this hearing for the first time that it was a procedure that it had to be approved and that he would not have allowed it to be destroyed without testing because that was the guidelines that he was there for. That's the first piece of evidence. The next one is the evidence from Midge Carroll, which we've talked about quite a bit, that shows that, in fact, she alerted the prosecution, and that two essential facts, that these shoes were only prison issued and were not available at retail, are untrue. The next evidence, which was not heard before, was the testimony of Christine Sloniker and Mary Mellon-Wolf, two women who saw three white men in the Canyon Corral Bar the night of the crimes and who testified that they were in a drug-type state and that one of them had blood spattered on his coveralls. The next person is Lance Stark, who also corroborated what Ms. Mellon-Wolf and Ms. Sloniker testified at this hearing, and this is all the first time it's ever been heard. And Stark testified not only that he saw the men with blood on them that night in the bar, but that after he contacted our people during this proceeding, he was the subject of an attempt to intimidate him from testifying. Next we have Exhibit UUU, which was the police log in which we found two essential things that have not been brought forward at trial back in 1985. The first of those two things was that there were three young males who were seen in the Ryan Station Wagon leaving the scene of the crime. That's what the police report says. The second thing that was in that daily log was the blue shirt. Wasn't there testimony from witnesses at the time about that, the couple? Yes, and this corroborates that, and it's new evidence to support that. Why is it new evidence when it's exactly the same evidence? Well, it may be cumulative evidence, but it's evidence from the police themselves that says that the suspects are three young males leaving the scene in the Ryan Station Wagon, something which the prosecution said was stolen by a petitioner. The next thing that came out of that was the blue shirt. We, of course, have a log that says that the blue shirt with blood on it was turned over to the police, and Laurel Epler, the woman who found it, testified at this hearing. None of this came before the jury back in 1985, that she did see that shirt and report it to the police and turn it over to the police. Now, the prosecution would like the court to believe that that's the same shirt as the tan T-shirt which has been tested here. There is a separate log entry for that shirt on a different day in a different location. It cannot be the same shirt. Not only are they both in separate dates, it's different places at different times, they're different colors. That shirt went missing, just like so much of the evidence in this case, and it has never been turned over. No wonder we couldn't have put it into evidence before the jury in 1985. The next fact we have is that James Taylor, the inmate who testified at trial that he had given Petitioner the ProCad dudes, testified in a declaration that in fact what he gave them was PK flyers. And what now has been shown is that virtually anything that Mr. Taylor says cannot be believed on either side. And yet he was the key person at the prosecution's case in 1985 to testify that he had given ProCads to the Petitioner. The fact of the matter is that the catalog that we just talked about is different. The catalog that was introduced at trial in 1985 for stride right was a catalog that was shown by the prosecution, of course, that showed only sales to institutional customers. The one that we showed for the first time in the district court is a catalog that shows for retail stores that they could buy the ProCad dudes, something which was not brought before the jury in 1985. All of this evidence, all of this evidence was not shown in 1985. And in fact, any place we pushed, we found new evidence that questioned the conclusions that have been found. And all we're asking for with respect to this proceeding is to have a shot at the jury, getting the proper testing done that will actually be conclusive one way or another, and the ability to prove that the Petitioner was innocent. Counsel, if I may, let me ask you a question. I'm having difficulty understanding exactly what it might prove if there's more testing of a T-shirt when, if I understand correctly, the jury that convicted had no evidence about that T-shirt. That is correct, Judge Gould. If the jury did not convict Mr. Cooper based on evidence of his blood on that T-shirt, then you have a theory the blood on it was tampered with years before the mechanism for these DNA tests were set. Let's assume you proved that. What would it show that would give you entitlement to relief if you showed the blood on the T-shirt had been tampered with when the jury didn't rely on that? What we'd be able to show through that, Judge Gould, which also relates to A41 and some of the other evidence that was used at trial, is that the police were tampering with evidence and that that type of ---- So your theory then is if you could show that the T-shirt was tampered with, that that would show that other evidence had been tampered with, I guess. Correct. We are challenging the evidence at trial with respect to what the prosecution's criminalist Gregonis did, not only at the time of trial with respect to the tennis shoes, but also with respect to A41. And we now have evidence, of course, in the hearings that came out during 2002 that Mr. Gregonis had actually lied under oath with respect to having taken A41 out and opened it up when he testified he had not done so. I think you've answered that question, and we've been a little bit generous in giving you additional time. Let me just ask the panel if anyone on the panel has additional questions. I do not. I do not. It appears not, so we thank you for your argument. We'd like to actually thank both counsel for very helpful and careful arguments this morning. The case just argued of Cooper v. Woodford is submitted and the court is adjourned.
judges: Rymer, McKeown, Gould